OPINION
{¶ 1} Appellant, Lisa McClay, appeals from a judgment of the Guernsey County Court of Common Pleas, Juvenile Division, granting permanent custody of the parties' minor child to appellee, Charles K. Reed, Jr., the child's biological father. Because the trial court acted within its discretion in granting custody to Reed, we affirm.
 {¶ 2} On July 9, 2003, McClay filed a motion seeking to modify Reed's visitation with the minor child and to increase child support payments. On August 9, 2003, after one of the child's visits with Reed, Reed filed a complaint for modification of legal custody and an ex parte motion for a temporary restraining order ("TRO") requesting temporary custody. The trial court granted the ex parte request for a TRO and granted temporary custody of the child to Reed. Thereafter, a full hearing was held. The trial court affirmed its decision and continued temporary custody with Reed until the final hearing on the parties' motions.
 {¶ 3} On November 25, 2003 and January 13, 2004, the trial court heard testimony from numerous witnesses. Ultimately, the court found a change of circumstances had occurred since the time of the initial custody order. Based on the evidence, the trial court awarded Reed custody of the child and overruled McClay's motions. McClay appeals, assigning the following errors:
I. The trial court erred in admitting the out of court statements of the minor child, , through the testimony of the father, counselor and stepmother and in introducing as evidence the court's own out of court notes regarding the prior in court testimony of the counselor.
II. The trial court erred in considering the testimony of the professional counselor regarding the veracity of the minor child's statements.
III. The trial court's modification of custody of the minor child was against the manifest weight of the evidence and contrary to law because the father failed to meet the requirements of ohio revised code 3109.04.
 {¶ 4} Because the third assignment of error requires us to address the relevant facts of the case, we consider it first. R.C. 3109.04(E)(1) provides that "[t]he court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, [or the] residential parent, * * * [and] that the modification is necessary to serve the best interest of the child." The "change" need not be a substantial one, but must be more than a slight or inconsequential change.Davis v. Flickinger (1997), 77 Ohio St.3d 415. Once the trial court determines the necessary change of circumstances exists, the statute mandates that the court retain the residential parent "unless a modification is in the best interest of the child" and, as applicable here, the court determines that "[t]he harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."
 {¶ 5} In determining the best interest of a child, the court shall consider all relevant factors, including, but not limited to: (a) the wishes of the child's parents regarding the child's care; (b) if the court has interviewed the child in chambers regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities, the wishes and concerns of the child as expressed to the court; (c) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) the child's adjustment to the child's home, school, and community; (e) the mental and physical health of all persons involved in the situation; (f) the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; (g) whether either parent has failed to make all child support payments, including all arrearages, that are required pursuant to court order; (h) whether either parent has been convicted of or pleaded guilty to any criminal offense involving any act of child abuse or neglect; (i) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with a court order; and (j) whether either parent has established a residence, or is planning to establish a residence, outside this state. R.C. 3109.04(F)(1)(a) through (j).
 {¶ 6} While both parties presented extensive testimony, we note at the outset that McClay did not file with the appellate court the transcripts for the August 22 and 28, 2003 hearings during which the trial court conducted an in camera interview of the child ("M").
 {¶ 7} McClay and Reed were never married and terminated their relationship in 1997 when M was three years old. Subsequently, McClay met Luke Dingus and began a relationship with him. McClay and Dingus began living together and currently have two children together, one of which was born after the November hearing. Reed married his current wife, April, in 1998 or 1999. They have two children together, one being born after the November hearing. M lived with McClay the entire eight and one-half years of her life, until August 2003.
 {¶ 8} Late in the 2002-2003 school year, M spoke to Reed concerning domestic violence between McClay and Dingus. Reed testified he did not initially call anyone at school because the school year was nearly concluded. He, however, approached McClay about the allegations, and McClay denied them. In August 2003, M again was visiting with Reed and repeated her allegations of domestic violence in McClay's home. As a result, Reed took M to counseling at Cambridge Counseling Center. Neither the counselor nor Reed informed McClay that M was going to counseling.
 {¶ 9} Reed admitted he took M to counseling in part to gain custody of her. He nonetheless affirmed the importance of M having a relationship with McClay. Reed stated that during M's separation from McClay after the August 2003 hearing, he and his wife encouraged M to maintain a relationship with her mother. Both Reed and April testified that M gets along well with everyone and has adjusted to her new home environment. Both are involved with M's schoolwork and are very willing to help her through the transitional period.
 {¶ 10} Joellyn Weidman, a licensed professional counselor, saw M on August 13, 2003 and testified M had "adjustment disorder" with depressed mood. Weidman stated that M was afraid of going to McClay's home because of Dingus and had called 9-1-1 three times to protect McClay from Dingus. Weidman also testified that M does not see her mother as a protector, but rather sees herself as the protector of her baby sister Ashley. According to Weidman, M reported constant arguing between McClay and Dingus that was sometimes so loud the neighbors could hear it.
 {¶ 11} Weidman further testified that M also was afraid to go to McClay's home because a young boy in the neighborhood, whom M knew, recently was murdered by the boyfriend of the boy's mother. Although Weidman testified she thought it was unusual that M lived with McClay for eight plus years and then suddenly wanted to change living arrangements, Weidman concluded that M witnessed "some pretty violent situations in which her mother was unable to get out of. And I believe [M] is fearful that if the violence switched to her, that her mother would be unable to protect her." (Tr. Vol. 1, 107.)
 {¶ 12} Weidman recommended that M be placed with her father or in foster care. Weidman recognized that placing a child in foster care over a parent is extreme and is used as a last resort. She nonetheless recommended foster care before returning M to McClay's home. According to Weidman, even if M entirely fabricated her allegations, Weidman's opinion would not change, because "if a person's perception is that they are afraid of something, the reality of it is insignificant * * * because what is fearful for me might not be fearful for someone else." (Tr. Vol. 1, 106.) Weidman acknowledged that the extent of fabrication would be a significant factor because she "would really want to know why a child would go to that length and that they must want something pretty badly." Id. During the summer of 2003, Children's Services conducted an investigation into McClay's home and found allegations of abuse unsubstantiated.
 {¶ 13} M's court-appointed guardian ad litem ("GAL") testified he had "genuine concerns for this girl," as it appeared to him "that there is something going on in this home, albeit I'm not sure exactly what." (Tr. Vol. II, 304-305.) The fact that M spent all of her life with McClay and suddenly wanted to live with her father indicated to the GAL that some type of physical abuse scared M. The GAL, however, was concerned with McClay's visitation rights. The GAL felt that, contrary to Reed's testimony, M was not being encouraged to visit with McClay. The GAL ultimately recommended that a change of custody would be beneficial, but also recommended that it be temporary and include frequent visitation with McClay.
 {¶ 14} Contrary to Weidman's testimony that M exhibited a depressed mood with a sad affect, McClay's numerous witnesses testified M was a talkative, outgoing young girl who never expressed any signs of abuse nor made any such allegations. The witnesses also testified that M and McClay seemed to have a good relationship.
 {¶ 15} The record reflects McClay's love for her children and her involvement in their lives. M was involved in dance, Girl Scouts, soccer, and Bible club. McClay was a volunteer at school and received a parent award for M's first and second grade classes.
 {¶ 16} McClay also helped out at the Head Start Program where her other daughter is enrolled, and McClay was a policy council representative for Head Start; Dingus was a policy council alternate representative. Jeannie Phillips, a family service advocate for Head Start, testified that both McClay and Dingus came to all the Head Start parent meetings and parent association meetings, where they worked with the families to establish guidelines for the children and teachers. According to Phillips, she personally conducted an in-home visit before enrolling McClay's other daughter in the program and saw no evidence of domestic violence. Phillips, however, had no reason to know of such allegations at the time and had never spoken to M.
 {¶ 17} McClay was asked at the hearing what she would do if M did not want to be around Dingus, and McClay responded "I don't know." (Tr. Vol. I, 253.) Further, McClay did not sufficiently explain her lack of visitation with M during the months between the August and November hearings. According to McClay, she drove to Reed's home each Wednesday and every other Friday to pick up M, but no one was there. McClay testified that although Reed suggested two-hour visits with M, M expressed a desire to have the visits take place at a neutral location with April in the vicinity; M did not want to stay overnight with Dingus. A letter from Reed's attorney states that Reed is "genuinely trying to find some solution for you to spend time with [M]. But, his suggestions don't appear to be acceptable." Reed's exhibit 1 ("the letter"). Indeed, McClay testified she did not think two hours was acceptable, but she offered no explanation for her failure to take advantage of that time to talk with M.
 {¶ 18} For example, on one occasion, McClay went to Burger King to meet M, and April told McClay the visit would stay at Burger King. McClay, apparently angry, refused to have what she believed to be a "supervised" visit with M and drove away. Although the visit did not take place, McClay never inquired whether April was staying in the restaurant with them. Indeed, April recorded that specific conversation between her and McClay, and McClay was the only person who mentioned supervised visits.
 {¶ 19} McClay also presented an expert psychologist, Dr. James Michael Harding who testified that Weidman's diagnosis of M was completely inconsistent with M's school records and the testimony of those who described M as an outgoing, talkative young girl. Dr. Harding opined that someone with a diagnosis of adjustment disorder with depressed mood would have problems with school functions as well as social interaction.
 {¶ 20} Dingus also testified at the November hearing, revealing in his testimony that he has another child outside McClay's home who was under his supervision until placed in foster care; Dingus pays child support for the child. Dingus was convicted of criminal damaging in 1999 for throwing bricks at and kicking a car owned by Timber Dingus. Dingus denied any acts of violence toward McClay or M.
 {¶ 21} As noted, R.C. 3109.04 requires a court to find a change in circumstances prior to modifying custody. In determining whether a change of circumstances has occurred, a trial judge, as the trier of fact, must "be given wide latitude to consider all issues which support such a change."Flickinger, at 416. Such a determination will not be disturbed on appeal absent an abuse of discretion. Id.
 {¶ 22} Here, the trial court received conflicting testimony. The trial court was clearly troubled by the fact that after residing with McClay for over eight years, M suddenly did not want to be near Dingus. Although McClay emphasizes that Dingus also was in the home for approximately three to three and one-half years of that time, the court noted that M certainly matured during those years and could better articulate her needs and wishes as well as her fears. Flickinger, supra (noting that although age alone is not sufficient to show a change in circumstances, the court may consider the maturing of the child). The trial court also could reasonably conclude that M's fear of Dingus was heightened after a boy M knew was murdered. Given the psychological evidence presented to the trial court, including M's fears, we cannot say the trial court abused its discretion in finding a change of circumstances.
 {¶ 23} Because the trial court found the requisite change of circumstances, it was required to determine whether a change in custody was in M's best interest. In that regard, the trial court issued findings of fact and conclusions of law. In accordance with R.C. 3109.04(F)(1), the trial court concluded that both parents wished to have custody of M, but M expressed a desire to stay with her father. R.C. 3109.04(F)(1)(a) and (b). Although the child was adjusted in her mother's home until recently, she subsequently had adjusted to her father's home and interacted more favorably in the father's household. R.C. 3109.04(F)(1)(c) and (d). The trial court concluded the physical health of all parties was good, but the mental health of the mother and Dingus was being tried, as the mother was having a hard time coping with recent events and Dingus historically has acted in an immature manner. R.C. 3109.04(F)(1)(e). The court recognized both parties have struggled with visitation and were going to have a difficult time with it due to M's extreme reluctance to participate. R.C. 3109.04(F)(1)(f). Child support was not in arrears. R.C. 3109.04(F)(1)(g). R.C. 3109.04(F)(1) (h), (i), and (j) are inapplicable.
 {¶ 24} Custody issues are "some of the most difficult and agonizing decisions a trial judge must make." Flickinger,
at 418. Where an award of custody is supported by a substantial amount of competent credible evidence, such an award will not be reversed as being against the manifest weight of the evidence. Id. "The reason for this standard of review is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." Id. Accordingly, an error of law is sufficient grounds for reversal but a difference of opinion with regard to the credibility of witnesses and evidence is insufficient. Id. at 419.
 {¶ 25} Substantial competent credible evidence exists to support the trial court's decision granting custody to Reed, including the child's wishes as expressed to the court, Weidman's testimony, and McClay's own testimony. From that testimony, the court reasonably could conclude M is afraid of Dingus and fears for her mother's safety, and that McClay is aware of M's fear but could not protect herself or M from Dingus, yet did not know what she would do if M did not want to be around him. In addition, the evidence supported a conclusion that McClay did not take advantage of her right to visitation during the separation, though more time spent together may have allowed McClay to better understand M's fears and may have provided McClay with the opportunity for the two of them to explore solutions to the problems. Moreover, the court noted that although M was only five years old when Dingus moved in with McClay, M's maturation over the next three years gave her a greater voice about her wishes and concerns, both of which the trial court properly should consider.
 {¶ 26} Accordingly, the trial court did not abuse its discretion in modifying custody in this case. The trial court received substantial testimony from numerous witnesses and clearly agonized over its decision. The trial court apparently found the testimony of Reed's witnesses to be more credible, and we will not substitute our judgment for that of the trial court. McClay's third assignment of error is overruled.
 {¶ 27} In the first assignment of error, McClay contends the trial court erred in allowing Weidman, Reed, and April to testify to statements M made and further erred in introducing into evidence notes taken in the previous hearings.
 {¶ 28} Neither party objected to the notes read into the record. To the contrary, both parties agreed and participated in using the notes in an attempt to avoid repetition in the November hearing as much as possible. Because no one objected, McClay waived the issue on appeal absent plain error. Winkler v.Winkler, Franklin App. No. 02AP-937, 2003-Ohio-2418, citingGoldfuss v. Davidson (1997), 79 Ohio St.3d 116. In civil cases, plain error must be used with utmost caution and applied only "to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." In re T.M., III,
Cuyahoga App. No. 83933, 2004-Ohio-5222, quoting Goldfuss,
at 121.
 {¶ 29} No plain error is evident in this case. The record does not suggest that had the notes not been read into the record, the outcome of the case clearly would have been different. To the contrary, a review of the transcript reveals the witnesses at the hearing repeated in some form or fashion most of the information in the notes. Those same witnesses, testifying at the November hearing, were subject to cross-examination. McClay accordingly fails to demonstrate plain error.
 {¶ 30} McClay, however, objected to hearsay testimony of Weidman, Reed, and April regarding statements M made to them. McClay complains that M did not testify and was not subject to cross-examination, thereby depriving McClay of her right to confront her witnesses.
 {¶ 31} The trial court has broad discretion in determining whether to admit hearsay statements under one of the exceptions to the hearsay rule. State v. Dever (1992), 64 Ohio St.3d 401,410. Hearsay is defined as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). In determining whether a hearsay exception applies, the trial court should consider the circumstances surrounding the making of the hearsay statement, such as whether the child's statement was in response to a suggestive or leading question. Id. The witness who brings the child's statements into evidence can be cross-examined about the circumstances surrounding the making of the statement. Id.
 {¶ 32} In Dever, the Ohio Supreme Court held that a trial court does not abuse its discretion when it admits a child declarant's hearsay statements made to a medical doctor for purposes of medical diagnosis or treatment under Evid. R. 803(4). Evid. R. 803(4) allows into evidence hearsay statements made for purposes of medical diagnosis or treatment describing medical history, past or present symptoms, pain, or sensations, or the general character of the cause or external source of the problem insofar as reasonably pertinent to diagnosis or treatment. The trial court need not first establish the child is unavailable to testify in order to apply the exception. Dever, at 412. "Once the statements are admitted, their credibility is a matter to be evaluated by the factfinder." Id.; In re Lane, Washington App. No. 02CA61, 2003-Ohio-3755.
 {¶ 33} Courts since Dever have applied the Evid. R. 803(4) exception to allow hearsay testimony from nurses, psychologists, psychiatrists, and therapists, so long as they are made for purposes of diagnosis or treatment. Lane, supra (admitting hearsay testimony of child's psychologist); State v. Geboy
(2001), 145 Ohio App.3d 706, 720 (concluding that licensed mental health counselor properly testified as to victim's statements to him under Evid. R. 803(4) exception, as the rule should not be read to encompass only those statements made to a medical doctor); Presley v. Presley (1990), 71 Ohio App.3d 34, 39
(admitting testimony of a social worker as to statements made by the victim child, as the social worker was in the best position to help determine proper treatment).
 {¶ 34} Here, Weidman's testimony is admissible under Evid. R. 803(4), as Weidman was M's licensed counselor. Nothing in the record suggests Weidman asked M leading questions. To the contrary, the record indicates M was open with Weidman after the first few initial visits and voluntarily informed Weidman of what took place at the McClay home. The statements Weidman testified to at the hearing were M's statements made for purposes of diagnosis as well as continuing treatment, including dealing with M's fear and the possibility of removing M from the home. Therefore, the trial court did not abuse its discretion in allowing Weidman's testimony regarding M's statements to her in their private counseling sessions.
 {¶ 35} With respect to the hearsay testimony Reed and April offered, McClay fails to demonstrate prejudicial error. The trial judge heard the same testimony from Weidman, whose testimony was properly admitted, from M's GAL, and perhaps from M herself in conducting its court interview with her. Accordingly, any error in admitting the testimony was harmless, as it did not affect the outcome of the case. McClay's first assignment of error is overruled.
 {¶ 36} In the second assignment of error, McClay contends the trial court erred in considering Weidman's testimony regarding the veracity of the minor child's statements. Prior to Weidman's testimony at the November hearing, the court read its notes with regard to Weidman's testimony at the August hearing, and it noted Weidman believed M's allegations and found M to be articulate, accurate, honest, and truthful in her statements. McClay acknowledges that neither party objected.
 {¶ 37} McClay's contentions are correct. State v. Boston
(1989), 46 Ohio St.3d 108, overruled on other grounds (holding that an expert may not testify as to that expert's opinion of the veracity of a child's statements). However, because neither party objected to the testimony, McClay waived any claimed error on appeal absent plain error. Winkler, supra.
 {¶ 38} McClay failed to demonstrate plain error regarding Weidman's testimony. Weidman specifically testified that even if M fabricated the allegations entirely, her recommendation to place M with Reed would not change, as M was exhibiting a significant problem in the McClay home. Therefore, McClay suffered no prejudice from the admission of the testimony regarding M's veracity because the outcome of the case would not have been different. Further, Weidman was extensively cross-examined with regard to her findings and recommendations. Accordingly, McClay's second assignment of error is overruled.
 {¶ 39} Having overruled McClay's three assignments of error, the judgment of the trial court is affirmed.
Judgment affirmed.
Bryant, Bowman and Klatt, JJ., concur.