OPINION *Page 2 
{¶ 1} Defendant-appellant Ray Charles Brown appeals from his conviction and sentence entered in the Stark County Common Pleas Court for rape, a violation of R.C. 2907.02(A)(1)(b). Five issues are raised in this appeal. The first issue is whether there was improperly admitted hearsay. The second issue is whether Brown was denied his right to effective assistance of counsel. The third issue is whether the conviction was against the manifest weight of the evidence. The fourth issue is whether sufficient evidence supported the conviction. The fifth issue is whether the prosecutor, in closing arguments, made statements that amounted to misconduct and whether that alleged error denied Brown his right to a fair trial. For the reasons stated below, the judgment of the trial court is affirmed.
 STATEMENT OF FACTS {¶ 2} On November 21, 2001, at approximately 12:30 p.m. D.H., a ten year old child with Asperger's disease, which is a developmental disorder that is similar to autism, was reported missing. (Tr. 120). The last place she was seen was at the Viaduct, a corner store in Alliance. She was found by the Alliance Police Department at around 2:00 p.m. (Tr. 119). When she was found she informed the officer, in her own words, that she had been sexually assaulted. (Tr. 106). Detective Roy Tittle of the Alliance P.D. then began investigating by interviewing D.H.
 {¶ 3} Detective Tittle indicated that while D.H. was ten years old she had the demeanor of a small child. (Tr. 106). He stated that he could tell right away that D.H. was mentally handicapped; she had a hard time articulating for a ten year old. (Tr. 106, 107). However, she did give a description of the location where the assault occurred and was able to lead him to that location, which was 350 South Seneca, Alliance, Stark County, Ohio. (Tr. 107, 108). Detective Tittle testified that this house was well known for homeless people to take shelter and for drug abusers to go to use drugs. (Tr. 109). Items such as cigarette butts, a blanket, a sheet, and beer cans were taken from the house because they might contain trace evidence. (Tr. 110).
 {¶ 4} D.H. also gave Detective Tittle a vague description of the perpetrator. She described the assailant as a "brown boy" with a gray moustache and blue eyes. (Tr. 107). *Page 3 
 {¶ 5} Following his interview with D.H., Tittle directed her parents to take her to Alliance Hospital. While at Alliance Hospital, her parents were instructed to take D.H. to Akron Children's Hospital.
 {¶ 6} At Akron Children's Hospital, Wendy Facchini, a clinical social worker with the hospital's child abuse evaluation center, interviewed D.H. She indicated that the purpose of the interview was to facilitate the medical exam. (Tr. 133).
 {¶ 7} Facchini stated that at the beginning of her exam it became clear that D.H. was emotionally immature for a ten year old; she lacked a lot of boundaries. (Tr. 139). Facchini stated that she used anatomical drawings for the child to identify body parts and to use for a discussion as to whether anybody touched D.H. in an inappropriate way. (Tr. 140-142). D.H. told Facchini, using the drawing, that someone had touched her vagina. (Tr. 142). She indicated that she was penetrated digitally. (Tr. 143). She also told Facchini that the man used his "long part" to touch her vagina. (Tr. 143). D.H. described the man who touched her in this way as a brown man with black hair and a moustache. (Tr. 144). She did not mention the man's eye color. (Tr. 144).
 {¶ 8} Following the interview with the social worker, D.H. was examined by Dr. Daryl Steiner. He explained that after being informed by Facchini about the history of the case, he did a head to toe physical examination of D.H. (Tr. 152-154). Given the history, he was looking for signs of trauma in the genitalia region. (Tr. 154). He found "a small superficial laceration" on D.H.'s genitalia. (Tr. 155). He explained that the injury indicated that there was "penetrating injury to the genitalia." (Tr. 155). He stated that he next collected specimens for a rape kit. (Tr. 156). Following the examination, Dr. Steiner determined that D.H. needed to be treated for the prevention of sexually transmitted diseases and also gave her a medication to prevent pregnancy. (Tr. 162).
 {¶ 9} At this point, Detective Tittle's investigation of the assault had led to a suspect, a Mark Edwards. (Tr. 113). He had allegedly been seen in the area with D.H. (Tr. 113). Edwards consented to giving a DNA sample. (Tr. 113).
 {¶ 10} Edwards' DNA sample and the rape kit taken from D.H. were sent to the Canton-Stark County Crime Laboratory. Jennifer Creed, an employee of the crime *Page 4 
lab, did DNA testing on the rape kit, which included swabs taken from D.H.'s vagina and rectum. The rape kit also included D.H.'s underpants. From the rectal swab, the only DNA type that was obtained was that consistent with the victim. (Tr. 208). From the vaginal swab, Creed obtained very little information from the semen present on it. (Tr. 208) However, the DNA found in D.H.'s underpants was a mixture of D.H.'s DNA and a male individual. (Tr. 208). The DNA of the semen found on the vaginal swab and the DNA of the semen found on D.H.'s underpants were compared to Edward's DNA. From that comparison, Creed excluded Edwards as a possible source of the semen. (Tr. 210).
 {¶ 11} At this point, Detective Tittle had no other leads. The DNA from the unknown perpetrator was put into the DNA database. (Tr. 212). In November 2005, Creed was informed by the state that the DNA profile for the unknown assailant was consistent with a profile in their database for Ray Brown. (Tr. 212). Creed then requested a DNA sample from Brown so that she could perform a DNA comparison between the DNA found on the evidence and the DNA from Brown.
 {¶ 12} At that point, Brown was in prison serving a felony. (Tr. 251-252). A search warrant was obtained so that a sample of Brown's DNA could be collected. (Tr. 115).
 {¶ 13} Creed performed a DNA comparison between the DNA found in D.H.'s underpants and Brown's sample. She concluded that Brown could not be excluded as a source of the DNA found in D.H.'s underpants. (Tr. 214). She stated that "approximately one person in 7,189,000 individuals could not be excluded as a possible source — or as a possible contributor to that mixture obtained from the underpants." (Tr. 214).
 {¶ 14} Detective Tittle then investigated to determine where Brown was on November 21, 2001, the day D.H. was sexually assaulted. (Tr. 117-118). He concluded through information sources and address checks that Brown was living one block away from where the sexual assault occurred. (Tr. 117-119).
 {¶ 15} On June 20, 2006, Brown was indicted for one count of rape, a violation of R.C. 2907.02(A)(1)(b). A trial by jury occurred on December 4 and 5, 2006. The *Page 5 
jury found him guilty. Brown was sentenced to a prison term of 10 years. He timely appeals raising four assignments of error.
 FIRST ASSIGNMENT OF ERROR {¶ 16} "THE TRIAL COURT ERRED BY IMPROPERLY ADMITTING HEARSAY TESTIMONY."
 {¶ 17} This first assignment of error contends that the trial court erred by allowing the admission of hearsay statements D.H. made to medical personnel at Akron Children's Hospital. Specifically, Brown concentrates on one statement that D.H. made to medical personnel about the assailant penetrating her with his penis. Brown contends that it was hearsay testimony, it did not fall under any exception and thus it should not have been admitted. Brown acknowledges that he did not object to the testimony.
 {¶ 18} The state counters Brown's argument claiming that while the statement is hearsay, it is admissible. It contends that the statement falls under the exception to the hearsay rule for statements made for purposes of medical diagnosis or treatment, Evid. R. 803(4).
 {¶ 19} Typically we review a trial court's decision on the applicability of a hearsay exception under an abuse of discretion standard of review. State v. Dever, 64 Ohio St.3d 401, 410,1992-Ohio-41, citing State v. Rohdes (1986), 23 Ohio St.3d 225, 229. However, as acknowledged by Brown, he did not object to the admission of the alleged hearsay statements. Thus, this alleged error is waived unless it rises to the level of "plain error." State v. Carter, 5th Dist. No. 07CA4, 2007-Ohio-5259, ¶ 14. Consequently, instead of reviewing under an abuse of discretion analysis, we must review this case for plain error.
 {¶ 20} "Crim. R. 52(B) provides that, `[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.' `Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. In order to find plain error under Crim. R. 52(B), it must be determined, but for the error, *Page 6 
the outcome of the trial clearly would have been otherwise. Id. at paragraph two of the syllabus." State v. Riffle, 5th Dist. No. 2007-0013, 2007-Ohio-5299, ¶ 58.
 {¶ 21} Statements D.H. made to medical personnel about the assault, including the statement that the assailant touched her with his "long part", is clearly hearsay testimony. That said, if as the state contends that testimony fell under the exception in Evid. R. 803(4), statements for purposes of medial diagnosis or treatment, then it was admissible.
 {¶ 22} The Ohio Supreme Court has stated that statements made for purposes of medical diagnosis or treatment are assumed to be reliable, since the effectiveness of treatment often depends on the accuracy of the information related. State v. Boston (1989), 46 Ohio St.3d 108, 121. However, the test to determine whether a statement made by a child is for the purpose of medical treatment or diagnosis is different than the test for a statement made by an adult. Dever, 64 Ohio St.3d at 410.
 {¶ 23} For cases involving child declarants, the trial court should consider the circumstances surrounding the making of the hearsay statement. Id.
 {¶ 24} "This inquiry will vary, depending on the facts of each case. For example, the trial court may consider whether the child's statement was in response to a suggestive or leading question (as was the case inIdaho v. Wright), and any other factor which would affect the reliability of the statements (such as the bitter custody battle inState v. Boston). If no such factors exist, then the evidence should be admitted. The credibility of the statements would then be for the jury to evaluate in its role as factfinder. In addition, the witness whose testimony brings in the child's hearsay statement can be cross-examined about the circumstances surrounding the making of the statement. But if the trial court discerns the existence of sufficient factors indicating that the child's statements were not made for the purpose of diagnosis or treatment, the statements must be excluded as not falling within Evid. R. 803(4)." Id. at 410-411.
 {¶ 25} The circumstances of this case are that D.H. first went to Alliance Community Hospital and then was referred by that hospital to Akron Children's Hospital. At Akron Children's, D.H. saw two medical personnel — Wendy Facchini, a clinical social worker, and Dr. Steiner, the medical examiner. *Page 7 
 {¶ 26} Facchini was the first to come into contact with D.H. She interviewed D.H. Facchini testified that the purpose of the interview was to facilitate the medical exam. (Tr. 133). The information she received from the child she told to the medical examiner, Dr. Steiner, and he used that information to conduct the medical exam. (Tr. 113-134, 137). He did not re-interview the child. (Tr. 134).
 {¶ 27} Facchini indicated that she was trained to use open ended and nonleading questions in the interview process. (Tr. 133). Facchini explained that she started the interview with a discussion of whether D.H. understood the difference between truth and lies. (Tr. 139). She indicated that D.H. was able to differentiate with examples and then she was also able to produce examples of her own. (Tr. 139-140). She then explained that she used anatomical drawings to have D.H. identify body parts and from there she asked D.H. to identify private parts that other people should not touch. (Tr. 141). D.H. was able to do this. (Tr. 141). From that point, Facchini asked if anyone had touched those places. (Tr. 142). D.H. indicated that someone had. (Tr. 143). D.H. told Facchini that "he stuck his finger up my crack where pee comes from, where pee comes out." (Tr. 143). She also indicated that he touched her vagina with his "long part." (Tr. 143). Facchini testified that D.H. did not know the man who did this to her, but described him as a brown man with black hair and a moustache. (Tr. 144).
 {¶ 28} Facchini then related that information to Dr. Steiner and he conducted a medical exam of D.H. (Tr. 152-153). He testified that he examined D.H. from head to toe. (Tr. 154). He indicated that he was looking for signs of trauma to the genitalia area. (Tr. 154). The exam revealed a small superficial laceration to the genitalia that was a penetrating injury. (Tr. 155). He explained that this injury helped to confirm the history and also led him to consider treatment for sexually transmitted diseases and pregnancy. (Tr. 155). In addition to the exam, he also collected specimens for a rape kit and he prescribed medication for the prevention of sexually transmitted diseases and medication to prevent pregnancy. (Tr. 156, 162). On cross-examination, he indicated that the purpose of examining D.H. was to determine whether or not she needed some type of medical treatment, but also to collect evidence. (Tr. 165-166). *Page 8 
 {¶ 29} Brown argues two factors that he believes indicate that D.H.'s statements to Akron Children's Hospital personnel do not fall within the Evid. R. 803(4) hearsay exception. First, he contends that that the statements were made after D.H. "had been treated at Alliance Community Hospital and transferred to Akron Children's Hospital for an [sic] sex abuse evaluation." Second, he argues that Dr. Steiner's statement that part of the purpose of his examine was to collect evidence, indicates that the questioning of D.H. was not done for the purpose of medical treatment or diagnosis.
 {¶ 30} Regarding Brown's first argument, it is true that D.H. first went to Alliance Community Hospital and then she was referred to Akron Children's Hospital. Facchini was asked why such an action would occur. (Tr. 137). She responded:
 {¶ 31} "Well, our hospital [Akron Children's] has the care center that evaluates for child abuse and we serve the surrounding counties." (Tr. 136).
 {¶ 32} Detective Tittle indicated that when D.H. was assaulted, it was normal protocol for her to be sent to Alliance Community Hospital and then that hospital would refer her to Akron Children's Hospital. (Tr. 112, 121). On cross-examination he was asked whether Alliance Community Hospital was capable of checking the well-being of a child and he responded:
 {¶ 33} "For those types of incidents, sexual assaults, severe assaults, they do not. They refer all their juveniles to Akron Children's Hospital to go to Dr. Steiner's unit." (Tr. 121).
 {¶ 34} This testimony clearly indicates that referring D.H. from Alliance to Akron was normal protocol because Alliance Community Hospital could not treat her. Moreover, there is no information in the record that D.H. received treatment while she was at Alliance Community Hospital. Dr. Steiner's testimony indicates that he did treat D.H. for possible sexually transmitted diseases and pregnancy. It seems illogical that Dr. Steiner would have treated D.H. if she had already been treated at Alliance Community Hospital.
 {¶ 35} Consequently, Brown's first argument fails. The fact that D.H. was sent to Alliance Community Hospital and then referred to Akron Children's Hospital does *Page 9 
not render the Evid. R. 803(4) hearsay exception inapplicable to statements D.H. made to personnel at Akron Children's Hospital.
 {¶ 36} Brown's second argument is that Dr. Steiner's indication that part of his purpose for examining D.H. was to collect evidence, renders testimony concerning D.H.'s statements to medical personnel inadmissible because they were not made for purposes of medical treatment or diagnosis. At the outset it is noted that Brown's argument seems to imply that Dr. Steiner's testimony was inadmissible hearsay. It appears he is under the mistaken belief that Dr. Steiner testified about statements D.H. made. That is an incorrect characterization of his testimony. His testimony solely concerned what was found during the medical exam. He did not testify about any statements D.H. made to him. Admittedly, Dr. Steiner indicated that his purpose in examining D.H. was for treatment and collection of evidence, however, since his testimony did not consist of any hearsay statements, that indication has no effect on him.
 {¶ 37} It might be concluded from reading his brief that Brown is insinuating that Dr. Steiner's testimony renders Facchini's testimony as to what D.H. told her during the interview inadmissible under the medical purposes exception. However, this argument is not persuasive.
 {¶ 38} As aforementioned, Facchini is a clinical social worker. SinceDever, courts have held that the exception in Evid. R. 803(4) is applicable to hearsay testimony from nurses, psychologists, psychiatrists, and therapists, so long as they are made for purposes of diagnosis or treatment. McClay v. Reed, 5th Dist. No. 2004CA4,2004-Ohio-7304, ¶ 33. A clinical social worker fits within that category of professions that the rule applies to. Thus, as long as the statements were made for purposes of diagnosis or treatment, they would fall under Evid. R. 803(4) as an exception to hearsay.
 {¶ 39} Brown cites this court to the In re Stuck (Nov. 3, 2000) , 5th Dist. No. 00CA4, case for the proposition that "statements made as part of the `collection of evidence' rather than for purposes of medical diagnosis and treatment, do not fall under" the Evid. R. 803(4) exception. In that case, this court stated: *Page 10 
 {¶ 40} "In order to review this assignment of error, we must look at the testimony of Nurse McCleery as a whole. The first inquiry is whether Nurse McCleery was involved in the diagnosis and/or treatment of a medical condition and was not serving as an evidence collector or making a case for the prosecution."
 {¶ 41} Here, Facchini's interview was not for collection of evidence. She clearly indicated that the purpose of the interview was to facilitate the medical exam; to help the examiner to determine what to look for, and to determine if the allegation of sexual abuse meshes with what was found. Her position is similar to that of the social worker inState v. Kelly (1994), 93 Ohio App.3d 257, 264. We stated there:
 {¶ 42} "We find that the social worker who did the initial history did it for the purposes of diagnosis and treatment." Id.
 {¶ 43} Furthermore, it has been held, statements made by child abuse victims to medical providers are not testimonial in nature. State v.Tapke, 1st Dist. No. C-060494, 2007-Ohio-5124, ¶ 72; State v.Martin, 10th Dist. No. 05AP-818, 2006-Ohio-2749, ¶ 21; State v.Johnson, 12th Dist. No. CA2005-10-422, 2006-Ohio-5195, ¶ 50; State v.Sheppard, 164 Ohio App.3d 372, 2005-Ohio-6065, ¶ 30; In re D.L., 8th Dist. No. 84643, 2005-Ohio-2320, ¶ 20. As can be seen from examining Facchini's testimony, D.H.'s statements to her were not testimonial in nature. Both Facchini and Dr. Steiner indicated that Facchini's interview of D.H. was for purposes of assisting the medical examiner and for medical treatment. Likewise, given Facchini's interviewing technique, there is indicia of trustworthiness associated with the statements D.H. made to Facchini.
 {¶ 44} Admittedly, D.H was not voir dired to determine whether the statements she made to Facchini were inappropriately influenced.Dever recognized that it is desirable to voir dire the child to determine whether the statements were inappropriately influenced by another and thus, would not have been made for the purpose of diagnosis or treatment. Dever, 64 Ohio St.3d at 410. However, this court has held many times that the failure to conduct a voir dire is not fatal to the admissibility of the evidence under Evid. R. 803(4). Sheppard,164 Ohio App.3d 372, 2005-Ohio-6065, ¶ 36, citing State v. Crum (Oct. 26, 1998), 5th Dist. No. 97-CA-0134; *Page 10 Kelly, 93 Ohio App.3d 257. This is especially the case where the child and the medical personnel are subject to cross-examination.
 {¶ 45} Here, although D.H. was not voir dired, she did testify by video deposition and was subject to cross-examination. Furthermore, Facchini also testified and was subject to cross-examination. Thus, the fact that a voir dire of the child did not occur does not in and of itself render the statements D.H. made to Facchini about the assault inadmissible. Moreover, as stated above, Facchini's testimony indicating her means of interviewing a child indicates that the child was not improperly influenced. Therefore, we conclude that Dr. Steiner's statement does not render Facchini's testimony inadmissible. Furthermore, Facchini's testimony falls within the medical purposes exception under Evid. R. 803(4).
 {¶ 46} Regardless, even if Facchini's testimony was inadmissible under Evid. R. 803(4) for any reason including defense counsel's failure to voir dire D.H., the admission of her testimony does not amount to plain error. As stated above, D.H. testified by video deposition. She testified that on the day of the assault she was down by the Viaduct, which is a little corner store, and a man asked her if she wanted to come with him. (D.H. Depo. Tr. 6). He then took a hold of her hand and walked her to his house. (D.H. Depo. Tr. 6). He then told her to take off her clothes and lay on the bed with him. (D.H. Depo. Tr. 7). She indicated that he kept his clothes on. (D.H. Depo. Tr. 14). She stated that the man touched her private spot with his hand and it hurt. (D.H. Depo. Tr. 9). She testified that he did not touch her with any other body part. (D.H. Depo. Tr. 9).
 {¶ 47} This testimony does not conform to her statement to Facchini that the assailant touched her with his "long part." However, this testimony does match Facchini's in that D.H. stated that the assailant penetrated her vagina with his finger. Digital penetration constitutes rape. R.C. 2907.02(A)(1); R.C. 2907.01(A).
 {¶ 48} Consequently, even if Facchini's testimony did not fall under the hearsay exception, it cannot be found that the outcome of the case would have been any different. We find that Dr. Steiner's testimony did not include any hearsay, Facchini's testimony fell within the Evid. R. 803(4) hearsay exception, and the failure to voir dire D.H. was not fatal. Furthermore, even if this court found error with the admission of *Page 11 
Facchini's hearsay testimony, that error did not amount to plain error. This assignment of error lacks merit.
 SECOND ASSIGNMENT OF ERROR {¶ 49} "THE APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 50} Brown's second assignment of error argues that he was denied his right to effective assistance of counsel. He contends multiple instances of ineffectiveness. First, he contends that counsel was ineffective because she failed to object to Facchini's and Dr. Steiner's testimony concerning D.H.'s statements about the assault. He also finds fault with trial counsel's failure to demand a voir dire of D.H. and failure to object to her competency. Lastly, he contends that trial counsel failed to object to the prosecutor's misstatements of fact during the closing argument.
 {¶ 51} "The standard of review of an ineffective-assistance-of-counsel claim is well established. Pursuant to Strickland v. Washington (1984),466 U.S. 668, 687, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that in the absence of those errors, the result of the trial court would have been different.State v. Bradley (1989), 42 Ohio St.3d 136." State v. Turner,168 Ohio App.3d 176, 2006-Ohio-3786, ¶ 26.
 {¶ 52} The first issue raised here is with the alleged hearsay testimony of Dr. Steiner and Facchini. As explained under the first assignment of error, Dr. Steiner's testimony did not consist of any hearsay. Thus, as it did not consist of hearsay, there was no basis for an objection and counsel was not ineffective. See, Carter, 5th Dist. No. 07CA4, 2007-Ohio-5259, ¶ 22.
 {¶ 53} Regarding Facchini's testimony, while it did contain hearsay, as was explained under the first assignment of error, that testimony was admissible under Evid. R. 803(4). Thus, as there was no error, there was no basis for an objection and counsel was not ineffective. Id.
 {¶ 54} Furthermore, even if it was in error and counsel's failure to object resulted in a deficient performance, Brown cannot establish the prejudice prong of ineffective assistance of counsel — that the outcome of the trial would have been *Page 12 
different. As was explained under the first assignment of error, D.H. testified that the assailant digitally penetrated her. She also told this to Facchini. Dr. Steiner's examination of D.H. revealed an injury that was consistent with that allegation. Furthermore, Brown's DNA was found in D.H.'s underpants. Thus, it cannot be concluded that the outcome of the trial would have been different.
 {¶ 55} Along those same lines, counsel's failure to request a voir dire of D.H. also did not amount to ineffective assistance of counsel. As aforementioned, the failure to voir dire a child is not fatal, especially when the child is subject to cross-examination. As to the failure to object to the competency of D.H., this also cannot be found to amount to ineffective assistance of counsel. D.H. was 15 years old when she testified. Admittedly, she was inflicted with Asperger's disease, a developmental disease. It may have been trial counsel's strategy to have her testify and use the inconsistencies in her testimony with that of the statements she made to Facchini to argue against the rape. Trial counsel may also have wanted to have her indicate the assailant had blue eyes, which Brown did not. Thereby, counsel could then argue that Brown is not the assailant.
 {¶ 56} Moreover, it may also have been trial strategy to not object to D.H.'s competency for fear that it would be determined that her mental age at the time of the assault was that of a child under the age of ten. As aforementioned, D.H. at the time of the assault was ten years old, however, she was also inflicted with a mental disorder. If it was determined that at the time of the assault her mental age was that of a child under 10 years of age, Brown, pursuant to the revised code, could have received a life sentence. R.C. 2907.02(B). In order to ensure that Brown could not be subject to a life sentence, trial counsel may have chosen to not object to her competency. We will not second guess trial strategy. State v. Mason, 82 Ohio St.3d 144, 157-158, 1998-Ohio-370. Thus, the argument that it was ineffective assistance of counsel to fail to object to D.H.'s competency fails.
 {¶ 57} Lastly, Brown alleges that the prosecutor misstated facts during the closing argument and that trial counsel was ineffective for failing to object to the testimony is also without merit. It is argued in the fourth assignment of error that the prosecutor misstated the facts during closing arguments and this act amounted to *Page 13 
prosecutorial misconduct. As will be discussed in depth in that assignment, the prosecutor only made one minor misstatement; she wrongly stated that D.H. testified that the man "stuck his fingers where the pee comes out." However, as is discussed in the fourth assignment of error, that misstatement does not amount to prosecutorial misconduct. As such, trial counsel was not ineffective for failing to object to the closing argument.
 {¶ 58} Regardless, even if it was prosecutorial misconduct, the failure to object to closing arguments, which was not evidence, may have been trial strategy and thus did not amount to deficient performance.State v. Fisk, 9th Dist. No. 21196, 2003-Ohio-3149, ¶ 9 (indicating that the decision to object is presumptively trial strategy) citing State v.Phillips, 74 Ohio St.3d 72, 85, 1995-Ohio-171. The misstatement concerns penetration. The transcript of the proceedings is clear that it was Brown's strategy to not dispute that D.H. was sexually assaulted, i.e. penetrated, but to rather claim that he was not the one who did it. He concentrated on D.H.'s description of the assailant as being a brown man with blue eyes and the fact that he did not have blue eyes. He also concentrated on the fact that while the DNA tester stated that he could not be excluded as a source of the DNA, the results did not indicate that he was the only person in the world who could be the source of the semen. Thus, the failure to object to a misstatement was trial strategy, which we will not second guess. State v. Mason,82 Ohio St.3d at 157-158, 1998-Ohio-370.
 {¶ 59} At any rate, even if the failure to object can be seen as deficient performance, the first prong of Strickland, Brown cannot establish that if his counsel would have objected and a curative instruction be given, the outcome of the trial would have been different, the second prong of Strickland. As stated above, D.H. testified that the assailant digitally penetrated her, Dr. Steiner's examination of D.H. revealed an injury that was consistent with that allegation, and Brown's DNA was found in D.H.'s underpants. Therefore, the failure to object to the one misstatement made by the prosecutor did not amount to ineffective assistance of counsel. This assignment of error lacks merit. *Page 14 
 THIRD ASSIGNMENT OF ERROR {¶ 60} "THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 {¶ 61} Brown raises both a sufficiency argument and a manifest weight of the evidence argument. A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Morrison, 5th Dist. No. 2007-CA-83, 2007-Ohio-4786, ¶ 11, citing State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600.
 {¶ 62} The test for sufficiency is whether the state has met its burden of production. State v. Thompkins, 78 Ohio St.3d 380, 390,1997-Ohio-52. This test raises a question of law. State v. Martin
(1983), 20 Ohio App.3d 172, 175. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Thompkins,78 Ohio St.3d at 386, 1997-Ohio-52.
 {¶ 63} The test for manifest weight, on the other hand, is whether the state has met its burden of persuasion. Id. at 390. On review for manifest weight, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. Id., citing Martin,20 Ohio App.3d 172, 175. The trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, thus the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus.
 {¶ 64} Brown was convicted of rape, a violation of R.C. 2907.02(A)(1)(b). This section states that no person shall engage in sexual conduct with another who is not the spouse of the offender when the other person is less than thirteen years of age, regardless of whether the offender knows the age of the other person. Sexual conduct is defined as vaginal intercourse, anal intercourse, fellatio, cunnilingus and *Page 15 
penetration, however slight, of any part of the body, without privilege to do so into the vagina or anus of another. R.C. 2907.01 (A).
 {¶ 65} The evidence submitted at trial established those elements. D.H., five years after the incident, in her own words, indicated that a man digitally penetrated her vagina. (Tr. 9). Facchini testified that on the day of the assault, D.H. indicated to her that a man not only digitally penetrated her, but that he also put his "long part" in her vagina, thereby indicating to Facchini that the assailant penetrated her with his penis. (Tr. 143).
 {¶ 66} Dr. Steiner testified that D.H.'s medical exam revealed a penetrating injury to her genitalia. (Tr. 155). Dr. Steiner also collected specimens for a rape kit, which included, among other things, a vaginal swab, a rectal swab and D.H.'s underpants. The only DNA found on the rectal swab was that of D.H. (Tr. 208). The vaginal swab contained mostly D.H.'s DNA, but also contained a very small amount of semen. (Tr. 208). From the underpants, there was a mixture of DNA from D.H. and a male individual. (Tr. 208).
 {¶ 67} Jennifer Creed, from the Canton-Stark County Crime Lab, compared the DNA found in D.H.'s underpants to that of Brown's. (Tr. 213). The testing revealed that Brown could not be excluded as a source of the semen on the underpants. (Tr. 214). "It was determined that approximately one person in 7,189,000 individuals could not be excluded as a possible source — or as a possible contributor to that mixture obtained from the underpants." (Tr. 214).
 {¶ 68} Testimony also revealed that D.H. was not Brown's spouse and that she was 10 years old when the incident occurred. (Tr. 106). This evidence, if believed, supports the essential elements of rape. Thus, the state met its burden of production; the evidence was sufficient.
 {¶ 69} Hence, we now turn to whether the conviction was against the manifest weight of the evidence. Admittedly there are some inconsistencies between D.H.'s testimony and the statements she made to Facchini. Specifically, during her deposition testimony, D.H. indicated that the assailant did not take off his clothes. However, when Facchini interviewed her at Akron Children's Hospital on the day of the incident, D.H. stated that her assailant got undressed. Also, D.H. testified that the assailant did *Page 16 
not touch her with anything except his hands. However, she told Facchini that D.H. touched her vagina with his "long part."
 {¶ 70} There is also the issue of D.H.'s description of the assailant. She told Detective Tittle that the man who assaulted her was a brown man with a gray mustache and blue eyes. Her testimony also indicated that the perpetrator was a brown man with blue eyes. Brown testified that his eyes are brown and that they never have been blue. (Tr. 250-251). Furthermore, he testified that he did not know D.H. and that to the best of his knowledge he had never seen her before. (Tr. 250).
 {¶ 71} Despite the inconsistencies in some of the testimony, and the fact that Brown claimed that he did not know D.H., it is difficult to conclude that the jury lost its way. Dr. Steiner indicated that D.H. had a small superficial laceration on her genitalia that evinced a penetrating injury. (Tr. 155). He stated that while this injury could have occurred from a fall, given what she told Facchini and that there was "no bruising or tenderness to the labia majora," that was unlikely to be the cause of the injury. (Tr. 155). He opined based upon his training, education and experience in the field of pediatric sexual abuse, the history and physical findings of D.H. indicated that she had been sexually abused. (Tr. 162). Likewise, even if D.H.'s testimony is only considered, and her statements to Facchini are ignored, her testimony still indicates that she was sexually assaulted by digital penetration.
 {¶ 72} Moreover, although D.H. testified that the perpetrator had blue eyes and Brown testified that he has always had brown eyes, he could not be excluded as a source of the semen found in the lining of D.H.'s underpants. In fact, the DNA tester indicated that only one person in 7,189,000 could not be excluded as a source of the semen. Or, in other words, you would see this DNA makeup in one out of 7,189,000 people. However, given that statistic — the one out of 7,189,000 — the tester could not state that he was the only possible source of the semen. (Tr. 229).
 {¶ 73} In addition to the above, Detective Tittle testified that at the time of the rape, Brown lived one block away from where the assault occurred. Brown confirmed this when he took the stand.
 {¶ 74} Given all of the evidence, this court cannot conclude that the verdict was against the manifest weight of the evidence. The jury was in the best position to sort *Page 17 
out any discrepancies in the testimony. This is especially the case here, where the jury was permitted to take notes during the trial and was also permitted to submit questions to the court for it to ask of the witnesses. The record reveals that this jury took an active role in this case; it asked many good questions. This assignment of error lacks merit.
 FOURTH ASSIGNMENT OF ERROR {¶ 75} "THE APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT."
 {¶ 76} Brown contends that during closing arguments prosecutorial misconduct occurred by way of the prosecutor misstating the facts. He contends that the misconduct affected the jury's judgment.
 {¶ 77} "The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. State v. Lott (1990), 51 Ohio St.3d 160, 165, certiorari denied (1990), 498 U.S. 1017. In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained of conduct in the context of the entire trial. Darden v. Wainwright (1986), 477 U.S. 168."State v. Ball, 5th Dist. No. 2005CA107, 2006-Ohio-3317, ¶ 26.
 {¶ 78} In Brown's allegation of prosecutorial misconduct, there are three specific statements made by the prosecutor that he directs this court to review. First, he contends that the prosecutor stated that D.H. "talked about her assailant sticking his finger up in the crack where pee goes." He contends that D.H. did not make any such statement in her deposition. Second, he asserts that the prosecutor stated that D.H. "talked about the man putting his `long part' thing on `her butt'." He contends that the prosecutor then stated that D.H. "had said this same thing to hospital staff in 2001." Brown maintains that those statements are inaccurate. Lastly, Brown asserts that the prosecutor "told the jury that penetration was established by the fact that Dr. Steiner found a `tear' on D.H.'s vagina." Brown argues that is an inaccurate description of Dr. Steiner's testimony.
 {¶ 79} Brown, however, did not object to any of these statements. Thus, unless this court finds plain error — that but for the comment, the outcome of the trial would *Page 18 
have clearly been otherwise — there will be no basis for reversal.State v. Walker, 5th Dist. No. 2005-CA-286, 2006-Ohio-6240, ¶ 57.
 {¶ 80} As indicated above, a closing argument must be reviewed in its entirety to determine whether prejudicial error occurred. State v.Frazier, 73 Ohio St.3d 323, 342, 1995-Ohio-235.
 {¶ 81} The complained of statements occurred when the prosecutor was rehashing the evidence that it believed supported the conclusion that penetration had occurred.
 {¶ 82} "We know that the Defendant engaged in sexual conduct with [D.H.] now that we heard all the testimony and heard from the doctor. What is sexual conduct? You are going to get a definition of that in your jury instructions. Sexual conduct in this case means vaginal intercourse. That means the insertion of any body part, whether it be a penis, or a finger, no matter how slight that penetration is, that is enough to constitute vaginal intercourse. What did you hear?
 {¶ 83} "You heard from [D.H.] in her video. He put his fingers up in the crack where pee comes out. You heard from the social worker who spoke with [D.H.] when this event was fresh in her mind back when she was ten years old, five years ago.
 {¶ 84} "Back then she said the same thing about the Defendant sticking his fingers up in the crack where pee goes. She also said that he had this long part on his body. On his butt. And that he put that long part on what she called her butt which she indicated was her vagina on the anatomical drawings that you all saw, he put his long part there and hurted it.
 {¶ 85} "So, ladies and gentlemen, there is evidence of penetration by the Defendant's fingers into [D.H.'s] vagina, as well as penetration with his penis. How else do you know that sexual conduct took place? [D.H.] had a tear on her labia minor and you folks will all have State's Exhibit 5. That's the medical record. You can take a look at that. You can see what Dr. Steiner wrote down five years ago regarding that tear.
 {¶ 86} "What did Dr. Steiner tell you about that tear? There's no other way that would have happened unless [D.H.] had experienced a fall. She did not say she fell. *Page 19 
And he also said there was nothing else that would indicate that that was a fall. There was no bruising to that outer tissue. So that's consistent with conduct as well.
 {¶ 87} "He said that that injury is consistent with penetrating trauma. Medical speak for something was inserted into that child's vagina." (Tr. 261-263).
 {¶ 88} Brown is correct that the prosecutor did misstate that D.H. indicated in her deposition that the man put his finger up the crack where the pee comes from. D.H. did not state that. Instead, she stated that the man touched her private spot with his hands and it did not feel good. (D.H. Depo. 9).
 {¶ 89} As to the second complained of statement regarding the man putting his "long part" on her vagina, when the prosecutor's comment is read in context, it does not appear that the prosecutor is indicating that D.H. testified to that in the video deposition. Instead, it appears the prosecutor is merely rehashing what D.H. told Facchini during the medical interview. That statement, then, would be completely accurate; Facchini testified that D.H. told her that.
 {¶ 90} The third complained of statement is that the prosecutor told the jury "that penetration was established by the fact that Dr. Steiner found a `tear'" on D.H.'s vagina. However, that allegation is not an accurate characterization of the prosecutor's review of Dr. Steiner's testimony. A review of the closing argument discloses that the prosecutor went through Dr. Steiner's testimony and indicated what he said about how the tear could have occurred. The prosecutor then reviewed Dr. Steiner's conclusion that based upon his exam and D.H.'s history, this tear was caused from penetration. The prosecutor did not misstate any evidence in doing this.
 {¶ 91} Therefore, the above shows that out of the complained of statements, there was only one misstatement — the indication that D.H. testified that the man stuck "his finger up in the crack where pee comes out." However, that one misstatement is not a major misstatement. Although D.H., during her testimony, did not state that the man stuck his finger up where the pee comes out, she does indicate that digital penetration occurred. She testified that he touched her private spot, which when questioned further she indicated was her vagina, with his hands and it did not feel good. Furthermore, D.H. did make that statement about the man sticking his finger up where the pee comes out to Facchini. *Page 20 
 {¶ 92} It is clear from the closing argument that all the prosecutor was trying to show in her rehash of the testimony was that penetration occurred. The one minor misstatement by the prosecutor, even if it was improper, did not affect a substantial right of Brown. Other evidence, including DNA testing and other witnesses' testimony, indicated digital penetration and penile penetration. Thus, this court does not find prosecutorial misconduct. However, even if we were to find prosecutorial misconduct, it does not rise to the level of plain error. State v.Tucker, 1st Dist. No. C-020821, 2003-Ohio-6056, ¶ 23 (stating it refuses to find plain error with minor prosecutorial misconduct). This assignment of error lacks merit.
 {¶ 93} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
 DeGenaro, P.J., Donofrio, J. *Page 1